Filed: April 15, 1999

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 98-1196
(CA-97-1577-A)

Estate of Mansy Y. Michael, etc.,

Plaintiff - Appellant,

versus

M. J. Lullo, etc.,

Defendant - Appellee.

O R D E R

The court amends its opinion filed April 2, 1999, as follows:

On page 20, first full paragraph, line 2 -- the cross-reference is corrected to read "infra at 21-2<u>4</u>."

On page 20, second full paragraph, line 1 -- the paragraph is corrected to begin "For the remaining <u>four</u> paragraphs . . . ."

On page 21, first paragraph, line 1 -- the cross-reference is corrected to read "at <u>15</u>".

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ESTATE OF MANSY Y. MICHAEL, by
David Michael, Executor,
<u>Plaintiff-Appellant,</u>

v.                                                                                     No. 98-1196

M. J. LULLO, District Director of
Internal Revenue Service,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CA-97-1577-A)

Argued: December 2, 1998

Decided: April 2, 1999

Before HAMILTON, LUTTIG, and KING, Circuit Judges.

_____

Reversed and remanded by published opinion. Judge King wrote the
majority opinion, in which Judge Hamilton joined. Judge Luttig wrote
a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** George Edward Cranwell, CRANWELL & O'CON-
NELL, Arlington, Virginia, for Appellant. Michelle Bachand
O'Connor, Tax Division, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Loretta C.

Argrett, Assistant Attorney General, Helen F. Fahey, United States Attorney, Richard Farber, Edward T. Perelmuter, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

**OPINION**

KING, Circuit Judge:

We are presented with the question of whether the district court had jurisdiction to entertain a taxpayer's mandamus action against the District Director of the Internal Revenue Service (IRS) and, if it did, whether it should have granted the writ compelling the District Director to allow a federal death tax credit that the IRS had previously agreed was accurate and allowable. On the narrow facts before us in this appeal, we conclude that the district court had jurisdiction and that the writ should be granted. Accordingly, we reverse the district court's dismissal for lack of jurisdiction, and remand for further proceedings.

I.

Mansy Y. Michael died on May 30, 1988, and his estate (the Estate) filed a federal estate tax return on August 30, 1989, reporting taxes in the amount of $175,487.[1] The IRS audited the return and assessed the estate an additional amount. The Estate originally objected to the additional assessment, but after negotiating extensively with the IRS, it consented to increase its estate taxes by $85,775.99.

On July 31, 1992, the IRS sent the Estate an Estate Tax Closing Letter (the Closing Letter) which confirmed, pursuant to the parties' negotiations, that the total estate tax had been assessed at $261,262.99. On its face, the letter purported not to be a "formal clos-

_____

[1] Section 2001 of the Internal Revenue Code imposes an estate tax on the transfer of the taxable estate of decedents who are citizens or residents of the United States.

2

ing agreement under section 7121 of the Internal Revenue Code," but represented that the IRS would not "reopen this case, however, unless Revenue Procedure 85-13, reproduced on the back of this letter, applies."

A substantial portion of the Estate was located in the United Kingdom and was administered there. Following the receipt of the closing letter, the Estate submitted to the IRS a timely"proof of credit" verifying that the Estate had paid taxes in the United Kingdom in the amount of $228,939.50 with respect to property situated there. The IRS credited this amount as a foreign death tax credit against the estate tax that had been assessed.[2] The IRS then sent the Estate an Estate Tax Computation Form indicating a balance due of $67,976. The Estate paid the balance on September 17, 1993, thus fully satisfying the estate tax burden as negotiated by the parties and assessed by the IRS.

On June 21, 1994--over nine months later--the IRS reopened the case. The District Director's office sent a letter to the Estate notifying it of a newly discovered error in the estate tax return. Namely, the IRS claimed that it had miscalculated the amount of the gross estate by simply failing to include the assets listed on Schedules B, D, and F of the return. As the IRS asserted, "This error resulted in the estate's not being assessed the tax on these assets in [the] first audit." As a result, the IRS concluded that its initial assessment had been $139,134 too low.

The District Director was aware that it could not assess additional

_____

[2] Against the estate tax imposed by I.R.C. § 2001, the taxpayer has the right to credit the amount of estate, inheritance, legacy, or succession taxes that it pays to a foreign country with respect to property situated in the foreign country and included in calculating the gross estate. I.R.C. § 2014(a). The credit is allowed if the taxpayer provides "proof of credit" to the IRS to verify the amount of taxes paid to the foreign country, the amount and date of each payment made, the description and value of the property in respect of which such taxes are imposed, and any other information necessary to verify and compute the credit. § 2014(d). If the amount to be credited exceeds the amount of taxes remaining outstanding, then the taxpayer may file for a refund of the excess. § 2014(e).

taxes against the estate because, as he acknowledged and explained in his June 21, 1994 letter, "the normal statute of limitations has expired." The District Director then took the extraordinary action that spawned this lawsuit, which the IRS now explains in its brief with surprising candor:

> The IRS . . . could not assess this additional amount against the taxpayer because the statute of limitations for assessing additional estate tax already had expired. Instead, the IRS reduced the amount of the claimed foreign death tax credit by the amount of the additional tax it determined to be due. The reduction of the claimed foreign death tax credit caused taxpayer to have an unpaid balance in its assessed tax liability.

The Estate responded with an administrative appeal, asking the District Director to reinstate the full amount initially allowed as a foreign death tax credit. When the administrative appeal was denied, the Estate filed this mandamus action in the district court, again seeking to compel the District Director to acknowledge the full amount of the foreign death tax credit. The IRS moved to dismiss, arguing that the district court was deprived of jurisdiction by the Anti-Injunction Act, I.R.C. § 7421, and that the Estate's mandamus petition should be denied on the merits. The district court granted the IRS's motion, finding that the plaintiff was not entitled to mandamus relief.[3]

_____

[3] While the district court appears to have decided the Estate's mandamus claim on the merits, it nevertheless dismissed the claim for lack of jurisdiction, citing the Mandamus and Venue Act, 28 U.S.C. § 1361. This decision could be read as suggesting that a district court's rejection of a mandamus claim on its merits necessarily negates that court's jurisdiction over the claim. See Vishnevsky v. United States, 581 F.2d 1249, 1253 n.4 (7th Cir. 1978) ("[T]he existence of § 1361 jurisdiction is unavoidably bound up with the merits."). But we have held that a plaintiff in a mandamus action need not "prove the merits of his case in order to establish jurisdiction. If the complaint states nonfrivolous allegations of the existence of the essential elements supporting a mandamus action, jurisdiction is established and a trial court must determine a remedy vel non on the merits." First Fed. Sav. & Loan Ass'n v. Baker, 860 F.2d 135, 138 (4th Cir. 1988).

4

II.

Initially, we must determine whether the district court properly dismissed this action for lack of jurisdiction. We review that decision de novo. Flood v. New Hanover County, 125 F.3d 249, 251 (4th Cir. 1997).

A.

Two competing statutes mark the jurisdictional boundary at issue here. The positive grant of jurisdiction is found in the Mandamus and Venue Act (the Mandamus Act): "The district court shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C.§ 1361. Though the Mandamus Act grants district courts jurisdiction over any suit seeking mandamus, it does not override the Anti-Injunction Act, I.R.C. § 7421. The Anti-Injunction Act withdraws all courts' jurisdiction over suits filed "for the purposes of restraining the assessment or collection of any tax."

To prevail, therefore, the Estate must show either that its claim does not implicate the Anti-Injunction Act or that it fits within the narrow exception to that act. For purposes of this opinion, and although we harbor serious doubts on this point, we will nevertheless assume that the Estate's mandamus action--which seeks to require the IRS to allow the full amount of its foreign death tax credit-- would have the effect of "restraining the assessment or collection" of its taxes.

B.

Thus the district court lacked jurisdiction unless this action fits within the narrow but well-established exception to the Anti-Injunction Act. Because we hold that this case does come within the exception, the Anti-Injunction Act did not destroy the jurisdiction conferred on the district court by the Mandamus Act.

As explained above, the plain text of the Anti-Injunction Act

5

deprives all courts of jurisdiction over any suit "for the purpose of restraining the assessment or collection of any tax." I.R.C. § 7421(a). But the Supreme Court has recognized an exception to this otherwise absolute language: "Only upon proof of the presence of two factors could the literal terms of § 7421(a) be avoided: first, irreparable injury, the essential prerequisite for injunctive relief in any case; and second, certainty of success on the merits." Bob Jones Univ. v. Simon, 416 U.S. 725, 737 (1974) (citing Enochs v. Williams Packing & Navig. Co., 370 U.S. 1, 6-7 (1962)).**4** The Estate's action is precisely the rare type of suit for which this exception was crafted.

1.

In analyzing the "certainty of success" factor, we must determine whether "under the most liberal view of the law and the facts, the United States cannot establish its claim," Williams Packing, 370 U.S. at 7; see also International Lotto Fund v. Virginia State Lottery Dep't, 20 F.3d 589, 592 n.3 (4th Cir. 1994) (recognizing that Anti-Injunction Act destroys jurisdiction unless it is "clear that the government `could in no circumstances ultimately prevail on the merits'" (quoting American Friends, 419 U.S. at 10)). In this case, the IRS claims that there is a deficiency in the Estate's return. In order to view the circumstances supporting this claim in the light most favorable to the IRS, we will adopt its own characterization of the operative facts.

First, the IRS asserts that its collection efforts are based on the tax assessed in its Closing Letter of July 31, 1992. In this letter--which was issued after extensive negotiations between the IRS and the Estate--the IRS assessed a net estate tax of $261,262.99. Second, the IRS acknowledges that the Estate discharged a portion of that tax liability by providing the IRS with "proof of credit," which demonstrated its payment of U.K. estate taxes in the amount of $228,939.50. Before the district court, and again at oral argument of this appeal, the IRS admitted that it does not contest the validity or amount of the foreign death tax credit that resulted from this payment. E.g., IRS Motion to Dismiss ("The [IRS] agrees that this amount [$228,939.50]

_____

**4** Accord United States v. American Friends Serv. Comm., 419 U.S. 7 (1974); Commissioner v. "Americans United" Inc., 416 U.S. 752 (1974).

6

represents the correct amount of foreign death tax credit to which the estate is entitled for U.S. federal estate tax purposes.").

Third, the Estate paid the balance of net taxes due, plus interest, all as calculated by the IRS on the Estate Tax Computation sheet that it issued. This cash amount, which the IRS admits receiving, totaled $67,976. The IRS further concedes in its brief that payment of this balance, taken together with the full amount of the foreign death tax credit would satisfy the Estate's tax liability as assessed in the IRS's Closing Letter. If, as the IRS contends, it did not thereafter assess any additional taxes; and if, as the IRS concedes, the claimed foreign death tax credit is valid and accurate; and if, as the IRS further concedes, the taxpayer has paid the assessed balance of $67,976, then there is no outstanding, assessed tax that the IRS may collect from the Estate.

Nor does the IRS claim that it validly assessed additional taxes after July 31, 1992. Instead, the IRS has conceded throughout these proceedings that, at the time it discovered its claimed mistake in the original assessment, the statute of limitations barred it from assessing additional taxes. The IRS is undoubtedly correct on this point; § 6501(a) of the I.R.C. requires the IRS to make all assessments on an estate tax return no later than three years after its filing. Here, the Estate's return was filed on August 30, 1989. As a result, the IRS could not assess additional taxes after August 30, 1992. Indeed, the IRS notes in its letter of June 21, 1994, that "the normal statute of limitations has expired." Because the IRS's own version of the facts indicates that the Estate has paid all taxes that have been and could ever be assessed on its return, the IRS's claim for further tax payments would appear to be doomed.**5**

_____

**5** The dissent incorrectly asserts that we are "directing the IRS to forgo the assessment and collection of taxes that all agree are owed by a taxpayer." Post at 19 (emphasis added). To the contrary, the Estate does not owe additional taxes, and we therefore do not agree that any additional taxes are owed. Had the IRS properly assessed the disputed amount during the limitations period, the Estate may well have owed those taxes. But as the IRS admitted in its June 21, 1994 letter, it did not, during the period of limitations, assess taxes on the assets listed on Schedules B, D, and F. Consequently, the statute of limitations not only

7

Nevertheless, the IRS argues that its reduction of the foreign death tax credit and the resulting deficiency determination were authorized by Lewis v. Reynolds, 284 U.S. 281 (1932). In Lewis, the IRS audited an income tax return and, within the applicable statute of limitations, assessed additional taxes. Id. at 283. The taxpayer paid the additional amount and sued the IRS for a refund. In the meantime, the statute of limitations ran, which prevented the IRS from assessing any further taxes on the return. But in response to the refund suit, the IRS again recalculated the taxes for the year in question, and it concluded that the taxpayer still had underpaid its taxes. As a result, the IRS refused the taxpayer's refund request.

The Supreme Court agreed with the IRS, holding that, although the IRS had been powerless to assess or collect additional taxes at the time of the refund suit, it was nevertheless permitted to recalculate those taxes in order to determine whether the taxpayer had overpaid its tax burden for the year in question:

> An overpayment must appear before refund is authorized. Although the statute of limitations may have barred the assessment and collection of any additional sum, it does not obliterate the right of the United States to retain payments already received when they do not exceed the amount which might have been properly assessed and demanded.

Id.

Thus Lewis simply provided the IRS with a "shield" it could use to ward-off refund suits; it did not forge a "sword" with which the IRS could assess or collect additional taxes in violation of § 6501(a). Indeed, cases that follow Lewis have emphasized the difference between refund suits and those in which the IRS seeks to collect a deficiency: "A deficiency determination, by which the IRS seeks to

_____

prevents the IRS from assessing these taxes in the future, it extinguishes potential liability for all such time-barred taxes. Diamond Gardner Corp. v. Commissioner, 38 T.C. 875 (1962) (cited in Ewing v. United States, 914 F.2d 499, 504 (4th Cir. 1990)). As a result, the taxes in dispute are not now and cannot ever be owed.

8

establish a taxpayer's additional tax liability, is patently different from a refund determination, by which the taxpayer seeks repayment or credit from the IRS." Bachner v. Commissioner, 81 F.3d 1274, 1277 (3d Cir. 1996). Lewis simply authorizes the IRS to "retain" tax payments in the face of a refund suit if, based on its calculations at the time of that suit, the IRS determines that the taxpayer did not actually overpay its properly calculated tax burden.

But Lewis cannot support the IRS's actions in this case. While Lewis does allow the IRS to refuse certain refunds, it does not allow the IRS's "collection of any additional sum" after the limitations period has expired, as it has sought to do here. Id.[6] Such a reading of Lewis would nullify the statute of limitations.

Lewis cannot be read as trumping § 6501(a), even taking the "most liberal view of the law and facts." Williams Packing, 370 U.S. at 1129.[7] Given the IRS's admission that Lewis is the only case which even arguably authorizes its actions here, we conclude that the IRS's claim for further payment on the Estate's return is baseless and certain to fail on the merits.[8]

(Text continued on page 11)

_____

[6] The district court sought to avoid this problem by referring to the IRS's actions as a "setoff." This view mischaracterizes those actions. Manifestly, the IRS may not set-off tax liability against the foreign death tax credit unless it has validly assessed that tax liability. Here, the IRS admits that it never assessed any additional tax liability to offset the death tax credit--nor could it have done so under the statute of limitations. Accordingly, the district court erred in characterizing the IRS's actions as a proper setoff of liabilities.

[7] Interestingly, the IRS's own reading of Lewis defeats its position here. The IRS acknowledges that, in Lewis, the Supreme Court "held that . . . the statute of limitations would bar the Government from collecting additional taxes from the taxpayer . . . ." IRS Br. at 15 (emphasis added). Here, the IRS seeks to collect additional taxes by ignoring a tax credit that the IRS admits is valid. Under its own reading of Lewis, then, the IRS's claim for additional payment must fail.

[8] We simply disagree with our dissenting colleague as to the proper reading and application of the Supreme Court's decision in Lewis v. Reynolds. In our view, the scope of the Lewis decision encompasses tax refund litigation only, and in no event can it reach the factual underpin-

9

nings of this case. This limitation of scope is unmistakable from the plain language of the Supreme Court's brief opinion.

The Court's three-sentence holding begins by acknowledging the IRS's implied authority to reaudit a return in response to a refund suit: "While the statutes authorizing <u>refunds</u> do not specifically empower the Commissioner to reaudit a return <u>whenever repayment is claimed</u>, authority therefor is necessarily implied." 284 U.S. at 283 (emphasis added). The Court then states an axiom of refund suits: "An overpayment must appear before <u>refund</u> is authorized." <u>Id.</u> (emphasis added). The paragraph concludes with an explanatory sentence--also quoted by the dissent--which simply confirms the IRS's authority to "<u>retain</u> payments already received when they do not exceed the amount which might have been properly assessed and demanded." <u>Id.</u> (emphasis added).

As a result, each sentence of the <u>Lewis</u> holding deals solely and expressly with refunds. When applied in its intended context, the Court's concise holding and its unadorned reasoning are perfectly clear.

Only when <u>Lewis</u> is conscripted into service outside the refund context --as the dissent and the IRS seek to do here--can its reasoning be made to seem "oblique." <u>Post</u> at 23. Tellingly, the analysis of <u>Lewis</u> made by the dissent fails to mention the linch-pin term of that decision: "overpayment." Having thus abstracted <u>Lewis</u> from the only context in which it is relevant, the dissent somehow divines from the twin powers that <u>Lewis</u> confers--the power to <u>reaudit</u> a return and the power to <u>retain</u> certain "payments already received"--a new, third power, namely, the power to affirmatively demand additional payments whenever the IRS discovers an error in its original assessment.

This authority would be triggered, in the dissent's view, whenever the taxpayer seeks "a reduction in the amount of tax <u>previously assessed</u>." <u>Post</u> at 23. The dissent concludes that submission of a valid foreign tax credit attempts such a reduction. Presumably, tendering a cash payment of one's full tax burden also triggers this new authority, as such a payment would, like a valid tax credit, satisfy and"reduce" the assessed tax burden. As a result, whenever a taxpayer discharges its tax burden-- either by writing a check or submitting a valid tax credit--the dissent would permit the IRS to demand payment of any taxes it ever could have assessed for the tax year in question, even if the applicable statute of limitations then bars any such additional assessment. If the <u>Lewis</u> Court intended to grant the IRS such a broad power, and thereby to silently abrogate the statute of limitations, it has disguised those intentions well.

10

Nor could the IRS possibly fare any better if the Estate now paid the alleged deficiency and sought a refund. Any such payments would be "overpayments" under I.R.C. § 6401, thus would be subject to mandatory refund. See I.R.C. § 6402. This is true regardless of which of its actions--the July 31, 1992 Closing Letter or the June 21, 1994 reopening letter--the IRS relies on as the "assessment" being litigated.

Presuming that the 1992 Closing Letter represents the operative assessment, the IRS itself has admitted that this letter did not assess the taxes on which its claimed deficiency is based. The IRS conceded in its 1994 reopening letter that the calculation error had caused it not to assess the taxes in question: "This error resulted in the estate's not being assessed the tax on these assets in [the] first audit." Because the Estate has, as shown above, undeniably discharged all taxes actually assessed in the closing letter, any current payment by the Estate would be payment of unassessed taxes.

The Estate would plainly be entitled to refund of any such amounts. Ewing v. United States, 914 F.2d 499, 504 (4th Cir. 1990). In Ewing, we were required to interpret I.R.C. § 6401, which specifies the consequences of an assessment or collection made in violation of the statute of limitations:

> The term "overpayment" includes that part of the amount of the payment of any internal revenue tax which is assessed or collected after the expiration of the period of limitations properly applicable thereto.

_____

Since it was decided in 1932, Lewis has been cited in more than eighty separate decisions of the Supreme Court and Circuit Courts of Appeals. Nearly all of these decisions have arisen from refund disputes, like Lewis itself; the rest have merely string-cited Lewis in general discussions of standards of proof applicable to tax cases. Significantly, the dissent relies on none of these decisions in support of its novel reading of Lewis. This is a powerful indication that, even under the most liberal reading of Lewis, the interpretation of that decision endorsed by the dissent and the IRS cannot prevail.

11

I.R.C. § 6401. If a tax payment is an "overpayment," the IRS must refund it. I.R.C. § 6402(a) ("In the case of any overpayment, the [IRS] . . . shall . . . refund any balance."); <u>Alexander v. United States</u>, 44 F.3d 328, 331 (5th Cir. 1995) ("[P]ayments made after the limitations period are defined as `overpayments' and, as such, must be refunded.").

The taxpayers in <u>Ewing</u> had made certain payments to the IRS, even though the IRS had never formally assessed those taxes. Some payments were made within the limitations period, and others were made after that period. Applying § 6401 to these facts, we concluded that while the IRS could retain unassessed tax payments it received within the limitation period, it must refund the other payments: "Since the amounts paid in 1985 were `collected' by the IRS outside of the period for assessment, with no assessment having been made, they come within [§ 6401's] definition of `overpayment'." <u>Ewing</u>, 914 F.2d at 504.

Thus <u>Ewing</u> makes clear that, where a tax liability has not been formally assessed, any payments of that liability submitted after the limitations period are overpayments under § 6401 and must be refunded. Here, the allegedly outstanding taxes were not assessed in the Closing Letter; in fact, they have never been assessed. If the Estate nonetheless pays the deficiency now and seeks a refund of its payment, <u>Ewing</u> would require the IRS to return those amounts. <u>Ewing</u>, 914 F.2d at 504.

The result of a refund suit is equally clear if the IRS relies on its 1994 reopening letter as the operative assessment. That letter was sent more than three years after the Estate's return was filed in 1989. As a result, any payment submitted in response to an assessment in that letter would constitute collection of a tax assessed after the statute of limitations, thus would be an overpayment under the plain language of § 6401. <u>See Alexander</u>, 44 F.3d at 331. As a result, the Estate would be entitled to a mandatory refund of any such payment.

It is undeniable, then, that the IRS cannot prevail against the Estate under any reading of the law, whether applied to the status quo or in the context of any future refund suit.

12

2.

But the Anti-Injunction Act still requires us to examine whether the Estate will suffer irreparable injury if not granted the relief it seeks. "Americans United", 416 U.S. at 758. The IRS contends that the Estate cannot be irreparably injured because it has another, adequate legal remedy. Cf. American Friends, 419 U.S. at 11 (inadequacy of available remedies goes to prove irreparable harm). Specifically, the IRS argues that the Estate may simply pay the disputed tax and seek a refund, first from the IRS, then in district court if necessary.

Under ordinary circumstances, the availability of a refund suit does negate any claim of irreparable injury. Id.; "Americans United", 416 U.S. at 762; Bob Jones Univ., 416 U.S. at 746; International Lotto Fund, 20 F.3d at 591. These are not ordinary circumstances. In this case the actions of the IRS are transparently baseless, in that it is pursuing this matter after the statute of limitations clearly has barred collection or assessment of further taxes. A refund suit under such circumstances is an inadequate remedy.

We must remember that this case began with the IRS's broken promise to the Estate. The IRS and the Estate had agreed on the Estate's tax liability after extensive negotiations. According to the terms of the Closing Letter that followed those negotiations, the IRS represented that it would not reopen the case "unless Revenue Procedure 85-13 . . . applies."

Under Section 4 of Rev. Proc. 85-13, reopening by the IRS is permissible in only three circumstances.[9] At oral argument, the IRS

_____

[9] Section 4 of Rev. Proc. 85-13 provides as follows:

> The Internal Revenue Service will not reopen any case closed after examination . . . to make an adjustment unfavorable to the taxpayer unless:
>
> 1. There is evidence of fraud, malfeasance, collusion, concealment or misrepresentation of a material fact; or
>
> 2. The prior closing involved a clearly defined substantial error based on an established Service position existing at the time of the previous examination; or
>
> 3. Other circumstances exist that indicate failure to reopen would be a serious administrative omission.

13

expressly disavowed the applicability of the first two prongs of Section 4, relying solely on the third prong as the basis of its reopening. By disavowing reopening premised on subsections 1 and 2 of Section 4, the IRS acknowledges that the taxpayer did not engage in fraud, malfeasance, collusion, or concealment or misrepresentation of a material fact. The IRS further acknowledges that the prior closing did not involve a clearly defined substantial error based on an established IRS position.

As noted, however, the IRS claimed at oral argument that it is entitled to renege on its express representation to the taxpayer, embodied in the Closing Letter, under the catch-all, third prong of Section 4 of Rev. Proc. 85-13. Subsection 3 of Section 4 permits reopening when "[o]ther circumstances exist that indicate failure to reopen would be a serious administrative omission." This "other circumstances" proviso of Rev. Proc. 85-13 is inappropriate and inadequate support for the IRS's breach of its promise not to reopen the Estate's case. Under these circumstances, we are skeptical of the bona fides of the IRS's position that, when the applicable statute of limitations has expired, failure to reopen the Estate's case for the purpose of increasing its tax liability results in a "serious administrative omission."

Having reopened the case, the IRS then launched a thinly veiled attempt, however described, to assess taxes in violation of the statute of limitations. In its 1994 reopening letter, the IRS conceded that the statute of limitations barred its assessment of additional taxes. Nevertheless, and "even though the normal statute of limitations has run," the IRS manufactured a deficiency by setting-off an admittedly valid foreign death tax credit against time-barred taxes it never assessed. At the end of the day, then, the IRS demanded additional taxes from a taxpayer who--upon the facts admitted by the IRS--had discharged all taxes that had ever been assessed against it. However the IRS labels its actions, they amount to an illegal assessment of taxes. See I.R.C. § 6501(a).

While this initial "mistake" is bad enough on its own, the IRS has maintained its baseless position for five more years. In the taxpayer's administrative appeal, before the district court, and again before this court, the IRS has insisted--despite its utter lack of legal support-- that the Estate should pay it more money. Such actions can have one of two possible causes: the IRS's shocking ignorance of the laws it

14

administers, or its utter disregard for the limits of those laws. Whatever the cause, the effect on the Estate is to force it either to pay the amount demanded or to continue fighting the IRS.

We simply will not, as the IRS requests, require the Estate to continue this fight in yet another forum. The IRS would have the taxpayer assemble the substantial sum needed to pay its manufactured deficiency--ten years after the Estate's return was originally filed--and again pay its attorney to file a suit for refund of that payment. As we have demonstrated above, the IRS is certain to lose any such suit; it will have to refund all payments. We will not require this waste of private, agency, and judicial resources.

Nor would forcing such a suit advance the purposes of the Anti-Injunction Act. The Act is designed to promote efficient and timely tax collection. It protects "the Government's need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference . . . ." Bob Jones Univ., 416 U.S. at 736 (emphasis added). Requiring taxpayers to file pointless refund suits to retrieve taxes that are unquestionably time-barred when collected cannot promote speedy tax collection. In fact, it would legitimize just the opposite. See Williams Packing, 370 U.S. at 7 (where IRS cannot prevail, "the central purpose of the [Anti-Injunction] Act is inapplicable").

The Anti-Injunction Act also is meant to protect the IRS from litigation pending a suit for refund. Id. at 8. Where, as here, the IRS acts in complete disregard for the tax code, it should not be surprised to find itself stripped of the code's protections.

Furthermore, it is the IRS's avoidance of the tax code's ordinary assessment mechanism that has deprived the Estate of the opportunity to contest the claimed deficiency without a refund suit. In the usual case, when the IRS determines that additional taxes are due from an estate, it mails the estate a Notice of Deficiency. I.R.C. § 6212. The estate may then, without first paying the asserted deficiency, file a petition in the Tax Court seeking redetermination of the deficiency. I.R.C. § 6213.

Here, of course, the Estate could not avail itself of the usual prepayment remedy in the Tax Court because the IRS never issued a Notice of Deficiency for the new amount. See Jensen v. IRS, 835 F.2d 196, 198 (9th Cir. 1987) (IRS failure to send notice of deficiency

15

deprived taxpayer of right to challenge deficiency in Tax Court). The reason for the IRS's failure to mail a Notice of Deficiency is plain: The limitations period of § 6501(a) barred its formal assessment of additional taxes. By seeking additional payments despite § 6501(a), then, the IRS not only ignored the limitations period, but it also deprived the Estate of its usual, pre-payment remedy in the Tax Court. The IRS cannot be permitted to force a more costly remedy on the taxpayer by its own avoidance of the tax code.

Given the IRS's foreclosure of a pre-payment remedy, we are especially sensitive to the equities in this case. Both we and the Seventh Circuit have discounted the IRS's argument that the taxpayer should seek other remedies where the equities of the case heavily favor the taxpayer:

> We note that [the IRS's] adequate remedy argument comes with particularly poor grace in the circumstances of this case. "Even tax administration does not as a matter of principle preclude considerations of fairness." Angelus Milling Co. v. Commissioner of Internal Revenue, [325 U.S. 293, 297 (1945)]. A suit for mandamus may be governed by equitable considerations . . . and the equities here are all on the side of the taxpayers.

Vishnevsky v. United States, 581 F.2d 1249, 1255 (7th Cir. 1978) (quoted in In re First Fed. Sav. & Loan Ass'n v. Baker, 860 F.2d 135, 139 (4th Cir. 1988)).

The current action is the only reasonable and efficient method by which the Estate may defend its rights, and the Estate will be irreparably harmed without it. See American Friends, 419 U.S. at 11 (inadequacy of available remedies proves "irreparable injury, an essential prerequisite for traditional equity jurisdiction"). Because the IRS also is certain to fail on the merits of its position, the Estate's action falls within the narrow exception to the Anti-Injunction Act. Bob Jones Univ., 416 U.S. at 737. The district court therefore had jurisdiction to decide the merits of the Estate's mandamus action. We now turn to this mandamus issue.

16

III.

A plaintiff may invoke the federal courts' extraordinary power to issue a writ of mandamus only by proving the co-existence of three elements: "(1) the petitioner has shown a clear right to the relief sought; (2) the respondent has a clear duty to do the particular act requested by the petitioner; and (3) no other adequate remedy is available." Baker, 860 F.2d at 138. Where mandamus relief is sought against a public official, "the alleged duty to act [must] involve a mandatory or ministerial obligation which is so plainly prescribed as to be free from doubt." Id. In assessing the Estate's claim, though, we remain mindful that "the right to a writ of mandamus may turn on equitable considerations." United States ex rel. Girard Trust Co. v. Helvering, 301 U.S. 540, 543 (1937).

As our above discussion makes clear, the Estate showed that it has a clear right to have the full amount of the foreign death tax credit recognized, thus to be free from additional collection efforts. Further, the IRS has a clear duty to provide such relief. The District Director has no discretion in allowing the foreign death tax credit; instead the tax code mandates this credit: "The tax imposed by section 2001 shall be credited with the amount of any estate, inheritance, legacy, or succession taxes actually paid to any foreign country." I.R.C. § 2014(a). Given the Director's lack of discretion, along with the baselessness of the I.R.S.'s actions, the Director had a clear duty to act as the Estate has requested.

As further stated above, no other avenue the Estate could pursue would "afford[ ] a remedy equally adequate and complete." Girard Trust Co., 301 U.S. at 544. Consequently, the Estate has no other reasonable way to vindicate its clear right to the requested relief, and the District Director has a clear duty to provide that relief. Finally, as in Baker, "the equities here are all on the side of the taxpayer[ ]." 860 F.2d at 139 (quoting Vishnevsky, 581 F.2d at 1255). We therefore conclude that the district court erred in dismissing the taxpayer's mandamus suit.

In so ruling, we do not intend to broaden the narrow class of cases for which mandamus relief is available. We have not declared "open season" on mandamus suits against the IRS. However, the mandamus

17

remedy exists for extraordinary cases. We are satisfied that the law-less actions attempted by the IRS here--while unsettling--truly are extraordinary.**10**

IV.

We therefore reverse the judgment of the district court and remand for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED

_____

**10** The dissent characterizes our opinion as "extraordinary." We make two points in response.

First, as we have emphasized, we agree that this case is extraordinary. Mandamus relief, even against the IRS, is proper in precisely such extraordinary cases. See Baker, 860 F.2d 135 (granting mandamus against IRS); Vishnevsky, 581 F.2d 1249 (same). And while the Supreme Court-created exception to the Anti-Injunction Act is narrow, it does exist, and for good reason. Thus the fact that mandamus suits enjoining the IRS from assessing or collecting taxes ordinarily fail does not mean that they are legally impossible; it simply means that, thankfully, facts such as these almost never arise.

Second, although the dissent argues that Supreme Court precedent forecloses our decision, the dissent has identified no case in which the Supreme Court, or any other federal court, having concluded that the IRS could not succeed under any view of the law or facts, nevertheless found itself without equity jurisdiction to grant mandamus. As a result, we are convinced that the uniqueness of these facts justifies the remedy we grant today, which the dissent correctly characterizes as "extraordinary."

While the dissent also describes our decision as "unprecedented" and "remarkable," it is hardly unprecedented or remarkable for courts to require government agencies to comply with the law. And when govern-ment agencies have acted in a lawless manner, it is neither unprecedented nor remarkable for them to be directed to cease and desist from lawless activity. In addition, it is hardly novel for government officials and gov-ernment agencies to be expected to comply with their representations to citizens, such as the representations made to the Estate by the IRS in the Closing Letter. Importantly, the most remarkable aspect of this situation and this decision must be that it involves an unprecedented and extraor-dinary set of circumstances not likely to recur.

18

LUTTIG, Circuit Judge, dissenting:

Today, for the first time in history, a federal court of appeals orders a federal district court to issue a writ of mandamus to the Internal Revenue Service under the Mandamus and Venue Act (which, it bears reminding, authorizes a court to compel an official only to perform a "mandatory or ministerial obligation which is so plainly prescribed as to be free from doubt"), in the face of the Tax Anti-Injunction Act (which, it likewise bears reminding, withholds jurisdiction from the federal courts over suits filed "for the purposes of restraining the assessment or collection of any tax") directing the IRS to forgo the assessment and collection of taxes that all agree are owed by a taxpayer. And this, despite the fact that the taxpayer has the alternative remedy of a postpayment refund action, as the majority itself acknowledges, and thus has no irreparable injury, and that the IRS is likely under no duty of law at all to forgo its assessment and collection efforts, but is certainly not under an indisputable discretionless duty to do so.

The significance of today's decision is evident from the mere statement of the court's holding. But it would be plain, if not from this, then from the court's repeated uncomfortable protestations of the "narrowness" of its holding and its own felt need to assure us (if unconvincingly) that it has "not declared`open season' on mandamus suits against the IRS." Ante at 17.

Because the court's extraordinary holding is directly and clearly foreclosed by not one, but two, federal statutes, not even to mention Supreme Court decisions, I dissent.

The two errors committed by the court in reaching its remarkable holding -- its conclusions that there is no adequate alternative remedy to mandamus relief in this case and that there is a legal certainty the taxpayer will prevail in its dispute with the IRS-- are so manifest that all of the bluster mustered by the majority toward the IRS cannot disguise them and little by way of discussion is needed to explain them.

First, although addressed second by the court for understandable reasons, the court holds that the plaintiff estate will be "irreparably

19

injured" in the absence of injunctive relief because the estate does not have an adequate alternative remedy to redress its alleged harm. The sole substantive reason given by the court for this conclusion (and this in barely two sentences, see ante at 13) is that "the actions of the IRS are transparently baseless, in that [the statute of limitations has run on the assessment and collection of additional taxes, and] [a] refund suit under such circumstances is an inadequate remedy," id.

Of course, the "baselessness" of the IRS' actions, even if that it be, but see infra at 21-24, is separate from and wholly irrelevant to the only legally relevant question of whether the estate does in fact have an adequate alternative remedy in the form of an administrative refund procedure. And it is undisputed that the estate does possess such a remedy: it can simply pay the unpaid balance of its assessed tax liability and then commence a postpayment refund action, like every other taxpayer must do. See I.R.C. §§ 6511, 6532, 7422. As the Supreme Court held in Bob Jones University v. Simon:

> These review procedures [a petition to the Tax Court or the payment of taxes, exhaustion of IRS internal refund proce-dures, and the filing of suit] offer petitioner a full, albeit delayed, opportunity to litigate the legality of the Service's [action].

416 U.S. 725, 746 (1974); see also United States  v. American Friends Serv. Comm., 419 U.S. 7, 11 (1974) (noting that plaintiffs will have a "full opportunity to litigate" their tax liability in a refund suit); Alexander v. "Americans United" Inc., 416 U.S. 752, 762 (1974) (same).

For the remaining four pages of its treatment of the "irreparable injury" requirement, see ante at 13-16, the majority turgidly com-plains about the inefficiency due to delay and the unfairness due to litigation costs of requiring the taxpayer to pursue this long-established procedure for taxpayer challenges to the IRS. See, e.g., id. at 15 ("We simply will not, as the IRS requests, require the Estate to continue this fight in yet another forum, [forcing it to] assemble the substantial sum needed to pay its manufactured deficiency . . . and again pay its attorney to file a suit for refund of that payment."); id.

20

at 15 ("We will not require this waste of private, agency, and judicial resources.").

The problem with invocation of this line of reasoning is that the Supreme Court squarely rejected it twenty-five years ago in <u>Bob Jones</u>, observing even at that time that "[t]he Court [had] dismissed out of hand similar contentions nearly 60 years ago, and [that it found] such arguments no more compelling [than it had] then." <u>Bob Jones</u>, 416 U.S. at 746. In <u>Bob Jones</u>, the taxpayer, like the estate in this case, contended that it would suffer irreparable injury if it were forced to litigate the availability of a tax exemption in a postpayment refund action. The Supreme Court rejected the taxpayer's arguments that a refund action would be an inadequate remedy, despite the fact that, as the Court recognized, such an action would "present serious problems of delay" and "place [the taxpayer] in a precarious financial position," <u>id</u>. at 747 -- the precise consequences relied upon by the majority here to justify its conclusion that an administrative refund action is inadequate. The delay and the resulting harm caused by a requirement of postpayment prosecution were justified, said the Court, "in light of the powerful governmental interests in protecting the administration of the tax system from premature judicial interference." <u>Id</u>.

Simply stated, the Supreme Court has confronted and rejected the very arguments relied upon by the majority herein. The Court has repeatedly held that the postpayment administrative refund action available to the estate in this case <u>is</u> an adequate alternative remedy to injunctive relief. The existence of this alternative remedy alone confirms the singular inappropriateness of the extraordinary mandamus remedy ordered by the majority.

Although the majority is evidently more convinced of its conclusion that the estate has a "certainty of success on the merits" of its dispute with the IRS than it is of its conclusion that the estate lacks an adequate alternative remedy, its error in this conclusion is no less palpable. "[U]nder the most liberal view of the law and the facts" -- the controlling standard of law, <u>Enoch</u> v. <u>Williams Packing & Navigation Co.</u>, 370 U.S. 1, 7 (1962); <u>see also American Friends</u>, 419 U.S. at 10 (noting that relevant inquiry is whether "it[is] clear that the Government could in no circumstances ultimately prevail on the merits") --

21

it is not even tenable, given the Supreme Court's decision in Lewis v. Reynolds, 284 U.S. 281 (1932), to maintain that the estate is legally certain to succeed in its dispute with the Service. In fact, if there were but two options (which of course there are not), it would be far more tenable to maintain that the IRS, not the estate, is legally certain to prevail in the action. But, as often is the case, the truth is actually somewhere on the continuum between these two alternatives, with neither party certain to succeed but the IRS more likely to do so than the plaintiff.

In Lewis, the Commissioner initially allowed an estate administrator's deduction for attorney's fees, but disallowed the administrator's deduction for inheritance taxes paid to the state, and assessed a deficiency. The administrator paid the deficiency and petitioned for a refund, arguing that the disallowance of the inheritance tax deduction was improper. In the ensuing refund proceeding, the Commissioner agreed that his initial disallowance of the inheritance tax deduction was improper, but reversed himself on the attorney's fees deduction, disallowing it. As a result, the estate owed additional taxes beyond those already paid. Accordingly, even though the statute of limitations for the assessment and collection of taxes had run, the Commissioner rejected the estate's petition for refund -- retaining, in payment of taxes due as a result of the eventual disallowance of the attorney's fees deduction, the monies that would otherwise have been refunded to the estate due to the initial improper disallowance of the inheritance tax deduction.

Upon certiorari to the Court of Appeals, which had affirmed the trial court's determination that the Commissioner had had the authority to redetermine and reassess the estate's tax even after the statute of limitations had run, the Supreme Court affirmed, reasoning as follows:

> Although the statute of limitations may have barred the assessment and collection of any additional sum, it does not obliterate the right of the United States to retain payments already received when they do not exceed the amount which might have been properly assessed and demanded.

Lewis, 284 U.S. at 283.

22

Lewis may well be dispositive, in the government's favor, of the legitimacy of the IRS' actions in this case. Here, as in Lewis, the IRS had, in its July 31, 1992, "Estate Tax Closing Letter," and well before the statute of limitations ran, already assessed the tax owed by the estate (in the amount of $261,262.99). In its original complaint, the estate even concedes that this assessment had been made: "On July 31, 1992 an Estate Tax Closing letter was issued, by the District Director, confirming, as per the above agreement, that the total Estate taxes had now been assessed at $261,262.99." See J.A. at 4 (emphasis added). Indeed, here, as in Lewis, the taxpayer had even agreed to payment of the assessed tax. And here, in effect if not also as a matter of law, as in Lewis, the taxpayer had actually paid the tax: in Lewis, the taxpayer had forwarded to the IRS the entire assessed amount and, here, the taxpayer forwarded a check in the amount of $67,976 and proof of a foreign tax payment for which it expected a credit in the amount of the remainder of the assessed and agreed-upon tax amount. Finally, in both cases -- in response to the taxpayer's refund action in Lewis and to the taxpayer's foreign tax credit request here -- the IRS thereafter determined in the course of evaluating the taxpayer's request for a reduction in the assessed amount that the taxpayer was not entitled to the reduction because of the discovery of tax liabilities which, in the words of the Supreme Court in Lewis, "might have been properly assessed and demanded" but which were not, and therefore denied the relief.

The Court in Lewis was oblique in its ultimate reasoning as to why it authorized the IRS' actions in that case. It may well have been because the Court concluded that the Service had not in any sense assessed a tax through its disallowance of the attorney's fees deduction; rather, it had merely refused to reduce the previously assessed tax amount. If this was the Court's rationale -- and, given that the Court authorized the IRS' actions against a challenge that the Service had assessed a tax after the statute of limitations on assessments had run, it would seem almost certain that it was -- then the IRS' actions in this case were unquestionably within its authority, because here, too, the IRS did nothing more than deny the taxpayer's request for a reduction in the amount of tax previously assessed. However, to the extent that the Court did conclude that the IRS had effectively assessed a tax because of the belated disallowance of the attorney's fees deduction in Lewis, and nonetheless allowed that assessment

23

despite the statute of limitations, to that same extent would it appear on the authority of that case that the IRS was allowed effectively to assess a tax on the overlooked assets here. For, on the dispositive question presented to the Court in <u>Lewis</u> and to this court of whether there was an untimely assessment of tax, there is no more of an assessment of tax outside the statute of limitations here than in <u>Lewis</u> -- and the majority offers not a single word of explanation for its conclusion otherwise.

Of course, that it appears on the authority of <u>Lewis</u> that the IRS may well have acted lawfully in denying the estate's foreign tax credit in the amount requested -- and most certainly appears to have done so on the most "liberal" view of the law -- is dispositive of whether the taxpayer estate is, as required for the issuance of a writ of mandamus in the face of the Anti-Injunction Act, "certain to succeed" on the merits of its dispute with the Service. If it appears on the basis of the extant Supreme Court authority that the <u>IRS</u> may well prevail on the merits, or even that it is at least possible that it will do so (which presumably not even the majority could deny explicitly), then <u>a fortiori</u> it cannot be said that the <u>taxpayer</u> is certain to succeed on the merits of the suit.

Therefore, of the two hurdles that the plaintiff estate must overcome to establish its entitlement to a writ of mandamus ordering the IRS to terminate tax assessment and collection efforts, in the face of the Tax Anti-Injunction Act, the plaintiff plainly does not clear either.

Whether one sympathizes or not with the majority's frontier instincts in this case, <u>see</u>, <u>e.g.</u>, <u>ante</u> at 14-15 ("[T]he IRS has insisted -- despite its utter lack of legal support -- that the Estate should pay it more money. Such actions can have one of two possible causes: the IRS's shocking ignorance of the laws it administers, or its utter disregard for the limits of those laws."); <u>id</u>. at 15 ("Where, as here, the IRS acts in complete disregard for the tax code, it should not be surprised to find itself stripped of the code's protections."), the IRS, no less than any other litigant, is entitled to the protection of the law. On the ground that the plaintiff has <u>not even arguably</u> satisfied the applicable requirements of law, I would afford the Service that protection and deny plaintiff the unprecedented mandamus relief it seeks, and now -- even to its own surprise no doubt -- has received from this court.

I respectfully dissent.

24